**POWELTON CIVIC HOME OWNERS ASSOCIATION by Hilburn Harbidge, Trustee ad litem**
and
**Carl W. Johnston, for Himself and for All Others Similarly Situated**
and
**Eva Novotny, for Herself and for All Others Similarly Situated**

v.

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Warren P. Phelan, Regional Administrator, Region II, Department of Housing and Urban Development, Robert C. Weaver, Secretary, Department of Housing and Urban Development, and Philadelphia Redevelopment Authority, Gustave Amsterdam, Chairman, Francis Lammer, Executive Director.**

Civ. A. No. 44197.

United States District Court
E. D. Pennsylvania.

Order Feb. 27, 1968.

Supplemental Order Feb. 29, 1968.

Memorandum and Order April 8, 1968.

Opinion and Order April 11, 1968.

Opinion and Order April 19, 1968.

Supplementary Order April 22, 1968.

Arsen Kashkashian, Jr., and Alexander Brodsky, Philadelphia, Pa., and Jan Krasnowiecki, Philadelphia, Pa., of counsel, for plaintiffs.

Paul Shalita, Philadelphia, Pa., for Philadelphia Redevelopment Authority.

Drew J. T. O'Keefe, U. S. Atty., and Merna Marshall, Asst. U. S. Atty., Philadelphia, Pa., for Dept. of Housing & Urban Development and Phelan & Weaver.

ORDER

BODY, District Judge.

AND NOW, this twenty-seventh day of February, 1968, the following orders in the above-captioned action shall be entered:

(1) The defendants' motions to dismiss the plaintiffs' action will be and hereby are GRANTED insofar as the plaintiffs' action rests on alleged violations of the Civil Rights Act of 1964, Title 42 U.S.C. § 2000d–1; however, insofar as the plaintiffs' action rests on the defendants' alleged violations of the National Housing Act of 1949 as amended, Title 42 U.S.C. §§ 1441–1465, and of the United States Constitution, the defendants' motions to dismiss will be and hereby are DENIED.

(2) The plaintiffs' request for an order directing the federal defendants to afford the plaintiffs an adjudicatory hearing under Section 5 of the Administrative Procedure Act, Title 5 U.S.C. § 554, or alternatively, directing the defendants to afford the plaintiffs any other appropriate hearing will be and hereby is DENIED.

(3) The plaintiffs' request that the Court issue a temporary injunction restraining and enjoining the defendants Robert C. Weaver, Warren P. Phelan, and the Department of Housing and Urban Development from providing any financial assistance to University City Unit No. 5, Urban Renewal Project No. Pa. R.–186, until a decision has been rendered upon the plaintiffs' complaint will be and hereby is GRANTED.

(4) The plaintiffs' alternative request that the Court review the merits of the federal defendants' substantive decision that the minimum requirements of Title 42 U.S.C. § 1441 et seq., have been satisfied will be and hereby is DENIED.

(5) The defendants shall answer the plaintiffs' complaint within ten (10) days after notice of the orders here entered. Fed.R.Civ.P. 12(a).

An explanatory opinion discussing fully the orders here entered will be filed forthwith.

SUPPLEMENTAL ORDER

AND NOW, this twenty-ninth day of February, 1968, it appearing that our order in the above-captioned matter dated February 27, 1968 requires clarification, the following is added:

In their complaint, the plaintiffs alleged several injuries and requested alternatively several forms of relief. This Court, in its order of February 27, 1968, dismissed all of the plaintiffs' claims save one: the alleged right to submit written and documentary evidence to the Administrator of the Department of Housing and Urban Development, and to have the Administrator consider such evidence in determining whether the University City Unit No. 5 project satisfied the requirements of the 1949 National Housing Act, as amended. 42 U.S.C. § 1441 et seq. The Court believes that the plaintiffs have standing to raise this procedural issue. In order to protect its jurisdiction and to avoid the threat of mootness, the Court considered it necessary to grant the plaintiffs' request for a preliminary injunction pending the defendants' answers to the plaintiffs' sole remaining claim and pending the Court's decision on the merit of that claim in this particular case.

As noted in our previous order, an opinion discussing fully all aspects of the February 27 order will be filed forthwith.

## MEMORANDUM AND ORDER

The Philadelphia Redevelopment Authority, one of the named party defendants in the above-captioned action, has filed alternative motions requesting either that the Court reconsider its orders of February 27, 1968 and February 29, 1968; or that the Court require the plaintiffs to post security as provided in F.R.Civ.P. No. 65. Additionally, the Philadelphia Redevelopment Authority requests an evidentiary hearing before this Court in order to determine the appropriate amount of the plaintiffs' bond.

Our orders of February 27 and 29, 1968, granted a preliminary injunction sought by the plaintiffs. The preliminary injunction was to continue until such time as this Court had finally ruled on the plaintiffs' right to permanent injunctive relief. The only impediment to such final ruling is the absence of the defendants' answer to the facts alleged in the plaintiffs' complaint; the defendants have chosen instead to file various motions contesting the legality of the orders already entered by the Court.

The preliminary injunction granted by the Court was not accompanied by an explanatory opinion. We felt that the injunction was necessary in order to protect our own jurisdiction and in order to protect the plaintiffs' claim from the threat of mootness. We also felt that the plaintiffs' complaint had alleged a cause of action sufficiently meritorious to withstand the defendants' motions to dismiss. Therefore it was necessary to issue the preliminary injunction order as soon as possible, if our jurisdiction and the plaintiffs' cause of action were to be adequately protected. However, because the issues involved in the defendants' motion to dismiss were many and complex, we decided to explain our orders in a detailed, comprehensive opinion; that opinion is immediately forthcoming.

However, the Philadelphia Redevelopment Authority requested reconsideration of our order or, alternatively, a giving of security by the plaintiffs. The Court intended to rule upon these motions after issuing its opinion explaining its original orders. However, we have been notified that the Redevelopment Authority is now seeking appellate review of our orders in the Third Circuit. In order that the appellate court may have the fullest understanding of the posture of the litigation at this time, we will now rule on the Redevelopment Authority's motions.

Our orders of February 27 and 29, 1968, granted preliminary injunctive relief *only* against Secretary Weaver and Regional Administrator Phelan. The orders restrained the Secretary and the Regional Administrator from disbursing federal funds to the Philadelphia Redevelopment Authority. The orders themselves did not restrain the Philadelphia Redevelopment Authority in any way whatsoever. At no time in this action have the plaintiffs sought any relief against the Redevelopment Authority; nor has this Court granted any relief against the Redevelopment Authority. We have been concerned only with the legality under federal law of the disbursement of federal funds by federal officers. As the plaintiffs explained in their brief and at oral argument, the Philadelphia Redevelopment Authority was named as a party defendant merely as a courtesy and in order to allow the Court to hear the local agency's point of view. They were not indispensable defendants; nor have they been legally affected by our decision in this case.

Under these circumstances, it is clear that the Philadelphia Redevelopment Authority is not entitled to demand that the plaintiffs post security. F.R.Civ. P. No. 65(c), on "Security", specifies that the security posted upon the issuance of a preliminary injunction shall be:

"[i]n such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered *by any party who is found to have been wrongfully enjoined or restrained*.

(Emphasis added). The *underlined* portion of the above rule explicitly describes the parties who may seek a bond. The Redevelopment Authority may or may not suffer financial loss if the federal funds here have been wrongfully enjoined; that financial loss may or may not have been due to its own conduct. These issues we do not resolve. It is clear that the Redevelopment Authority has *not* been enjoined by this Court; thus it cannot have been *wrongfully* enjoined; and therefore it is not entitled to demand security under F.R.Civ.P. No. 65(c).

The Redevelopment Authority's motion for reconsideration rests on two grounds: (1) the plaintiffs have already been afforded a procedural opportunity to submit *documentary evidence to Secretary* Weaver and thus their claim to such relief is moot; (2) the plaintiffs did not request a preliminary injunction in their complaint and thus no such relief should be granted until the plaintiffs have demonstrated their need for such relief at an evidentiary hearing.

First, since no legal relief has been granted against the Redevelopment Authority, we do not believe that the agency has standing to request reconsideration of our orders. Second, from the facts alleged in the plaintiffs' complaint, we do not believe that the plaintiffs have been afforded the procedural opportunity which they have requested; Secretary Weaver authorized the grant contract *before* he offered the plaintiffs an opportunity to "discuss" the legality of the contract with Regional Administrator Phelan; nor were the plaintiffs ever offered an adequate opportunity to reduce such oral testimony as they might have to documentary form. Third, the plaintiffs' complaint clearly indicated that the federal funds had not been disbursed to the Redevelopment Authority; were the funds to be disbursed, the issue of the legality of the disbursement would become moot. We concluded that a preliminary injunction preventing such disbursement was necessary if our own

jurisdiction was to be protected, and if the plaintiffs were to receive substantial justice under the federal constitution. We believe the plaintiffs' failure to include a request for such specific relief in their complaint is irrelevant; we further believe that paragraph (e) of the plaintiffs' complaint, at page 12, which requests that the Court "grant plaintiffs such relief as justice and equity may require", can be construed as a request for the preliminary injunctive relief which we have granted.

### ORDER

AND NOW, this eighth day of April, 1968, for all of the above reasons, IT IS ORDERED that the motion of the defendant, Philadelphia Redevelopment Authority, for reconsideration of the Court's orders entered on February 27, 1968 and February 29, 1968, will be and hereby is DENIED.

IT IS FURTHER ORDERED that the motion of the defendant, Philadelphia Redevelopment Authority, for an order requiring the plaintiffs to post security and for an evidentiary hearing, will be and hereby is DENIED.

### OPINION AND ORDER

The pivotal issue in this most complicated case concerns the decisional procedures to be followed by the Secretary of the Department of Housing and Urban Development in determining whether a local urban redevelopment project has qualified for a federal grant under Title I of the National Housing Act, 42 U.S.C. §§ 1441–1465. Necessarily, the case also requires analysis of the relationship between the federal judiciary and the federal administrative agency created by Congress to facilitate the national housing policy goal of "a decent home and a suitable living environment for every American family." 42 U.S.C. § 1441.

The plaintiffs in this class action represent the interests of property owners, residents, and tenants in an area of Philadelphia which is essentially

residential in character.[1] The Philadelphia Redevelopment Authority, a local public agency authorized by state law to undertake urban redevelopment projects and a named defendant in this action, has notified the plaintiffs that an urban renewal project known as University City Unit No. 5 will require acquisition of the plaintiffs' homes and properties. The University City Unit No. 5 project is being financed substantially under a federal grant authorized by the Secretary of the Department of Housing and Urban Development pursuant to the provisions of the National Housing Act. The plaintiffs, in an indirect attempt to prevent their homes from being acquired and razed under the state's eminent domain power, seek to enjoin the federal Secretary from disbursing funds to the Philadelphia Redevelopment Authority.

The plaintiffs' complaint, filed on November 28, 1967, alleges that Robert Weaver, the Secretary of the Department of Housing and Urban Development, has failed to afford the plaintiffs an appropriate procedural opportunity to demonstrate why the challenged project does not satisfy the National Housing Act requirements. The plaintiffs contend that such procedural opportunity is implicitly guaranteed both by the Housing Act and by the federal constitution. Relief is requested in the form of an injunction restraining Secretary Weaver from disbursing any funds to the local Redevelopment Authority for the challenged project until the Secretary has granted the plaintiffs the desired procedural opportunity to protest the project; and has then decided the propriety of federal financial assistance in light of the evidence supporting the plaintiffs' protest.

Counsel for the complaining citizens have made it quite clear that the primary relief which they request does not require this Court to review the substantive merit or policy of Secretary Weaver's decision to authorize funds for the project at issue. The plaintiffs request instead that we determine whether the Secretary must consider the point of view of the citizens whose homes will be razed by the project before he decides the eligibility of the project for federal funds. However, in the alternative should the Court refuse to grant the procedural relief requested, the plaintiffs do ask that we review the substantive correctness of the Secretary's decision.

The complainants invoke the jurisdiction of this Court pursuant to Title 28 U.S.C. § 1331, which provides for federal court jurisdiction of all civil actions arising under federal law; Title 28 U.S.C. § 1361, which provides federal court jurisdiction of mandamus actions to compel an officer, employee, or agency of the United States to perform a duty owed to the plaintiff; and Title 5 U.S.C. § 702, which provides for judicial review of agency actions in certain cases.

The defendants each filed motions to dismiss the plaintiffs' complaint, and on December 12, 1967, a hearing on the defendants' motions was held before this Court. All parties presented oral argument; no testimony was taken, nor any evidence accepted; the motions were taken under advisement.

On February 27th and 29th, 1968, this Court entered an order and a supplementary order granting the defendants' motions to dismiss every basis for relief alleged in the plaintiffs' complaint save one: the Court considered the plaintiffs' alleged procedural right to submit written and documentary evidence to the federal Secretary to be worthy of further consideration. The defendants were ordered to answer the plaintiffs' allegations with respect to this procedural right within ten days. Additionally, in order to protect its own jurisdiction by preventing the issues in the case from be-

---

1. The residential area extends approximately ten square blocks and is bounded by Powelton Street on the north, Chestnut Street on the south, Thirty-fourth Street on the west, and Thirty-third and Thirty- second Streets on the east. The Powelton Civic Home Owners Association represents approximately one hundred residents in the area.

coming moot, the Court entered a preliminary injunction restraining the federal defendants and specifically defendant Secretary Weaver and defendant Regional Administrator Phelan from providing any financial assistance to University City Unit No. 5. The preliminary injunction was ordered to continue until the Court had rendered a final decision on the merit of the plaintiffs' complaint. Of course, no final decision could be entered until the defendants had been afforded an appropriate opportunity to answer that portion of the plaintiffs' complaint which had not been dismissed. See Fed. R.Civ.P. 12(a).

The Court's orders on February 27th and 29th were not accompanied by an explanatory opinion. The purpose of this opinion is solely to explain those orders. Other issues subsequently raised by the defendants will be resolved by separate orders and separate opinions.[2] We shall discuss here only the defendants' motions to dismiss and the preliminary injunction which we have already ordered.

I. *The Civil Rights Act of 1964:*

Among the allegations in the plaintiffs' complaint is the claim that the plaintiffs are entitled to a hearing under Section 602 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–1. The claim rests on the vague contention that "the urban renewal contract entered into by the Secretary for the instant project * * * is violative of the Civil Rights Act of 1964." Plaintiffs' Complaint, p. 10. The plaintiffs have not elaborated upon this argument either in their brief or in their supplementary brief, nor was the argument clarified during oral argument before this Court. Thus the grounds for relief are no more specific than the general prohibition in the statute; "no person * * * shall * * * be subjected to discrimination under any program * * receiving Federal financial assistance."

42 U.S.C. § 2000d. The complaint fails to allege any specific discriminatory conduct on the part of any of the defendants.

On September 11, 1967, counsel for the plaintiffs wrote Secretary Weaver informing him of their complaints with respect to the challenged University City project. In terms almost identical to those used in the complaint filed in this Court, they alleged violations of the Civil Rights Act of 1964. In a reply letter, Secretary Weaver explained as follows:

"[T]he brevity of your allegations in this regard precludes a determination at this time of whether an investigation is warranted * * * [R]egulations (copy enclosed) require a Local Public Agency to file certain assurances to the effect that they will comply with all provisions of the Civil Rights Act. Since the Redevelopment Authority of the City of Philadelphia has given the necessary assurances with regard to this project, it will be necessary for you to indicate the specific areas in which you allege that the Local Public Agency is not in compliance."[3]

Secretary Weaver also offered the assistance of the Regional Administrator's office in formulating and presenting a complaint.[4]

Plaintiffs' counsel replied to Secretary Weaver on October 24, 1967. He reasserted the allegations founded on the National Housing Act, but did not mention the Civil Rights contentions. Nor do the plaintiffs' complaint, affidavit, exhibits, or briefs contain any mention of attempts to comply with the regulations received from Secretary Weaver or to follow his advice by presenting the Civil Rights claims to the Regional Administrator.

The letters in the plaintiffs' exhibits thus indicate that any arguments based on the Civil Rights Act have not been

---

2. These issues include the defendants' motions for reconsideration and motions to compel the plaintiffs to post security, and, of course, the plaintiffs' right to any final relief in this Court.

3. Plaintiffs' Complaint, Exhibit B, Letter from Robert C. Weaver to Arsen Kashkashian, Jr., October 5, 1967.

4. Ibid.

processed as directed by the agency. The statutory provisions of Section 2000d–1 authorize the agency to effectuate Section 2000d by issuing rules and regulations "consistent with the achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." Secretary Weaver informed the plaintiffs of those regulations, and requested compliance with their requirements. See 24 C.F.R. § 1.7. The plaintiffs made no attempt to so comply.

■ We believe that the intent of Section 2000d–1 is to assure that the agency authorized to disburse the funds which are allegedly financing discriminatory conduct will be the primary investigator of claims under Section 2000d. By failing to follow the procedures established by the agency for the presentation of such claims, the plaintiffs have precluded themselves from receiving an agency hearing on their Civil Rights allegations. They cannot ask this Court to provide a remedy which they have not properly pursued. The administrative remedy apparently remains available; if the plaintiffs believe their Civil Rights claim to have merit, they should pursue the desired hearing in the manner deemed appropriate by agency regulations.

For these reasons, the defendants' motions to dismiss the plaintiffs' cause of action insofar as it rested upon the Civil Rights Act of 1964 was granted.

## II. *The National Housing Act*:

The defendants also have moved to dismiss the plaintiffs' cause of action insofar as it rests on the contention that Secretary Weaver has exceeded the scope of his authority under the National Housing Act of 1949, as amended. The various issues raised by the defendants will be discussed separately; first, however, it is. necessary to consider the relevant statutory framework of the Housing Act in order to place the issues in their proper context.

### A. *Statutory Provisions*

The declared purpose of the Housing Act is "the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family." 42 U.S.C. § 1441. The Housing and Urban Development Agency (hereinafter "HUD") is to exercise its powers, duties, and functions "under this or any other law, consistently with the national housing policy declared by this Act." Ibid. The basic function of HUD is to make available advances, loans and grants to local public agencies (such as the Philadelphia Redevelopment Authority) for urban renewal projects "in accordance with the provisions of this subchapter." 42 U.S.C. § 1450. Thus, as in the present case, the local public agency formulates the renewal plan and will acquire the property; HUD reviews the plan submitted by the local agency to determine whether it satisfies federal requirements (infra) and substantially finances the local agency's expenses in acquiring and redeveloping the particular urban area. The federal government does not acquire or redevelop the properties; the purpose of the Housing Act is rather to encourage the cities to redevelop themselves by making federal funds available for all qualified projects.

However, although HUD does not actually acquire or redevelop the properties, the agency is required to perform a planning control function; the availability of the advances, loans, and grants is conditioned upon whether the project plans satisfy certain specified federal criteria. For example, 42 U.S.C. § 1451 provides that the Secretary (or his delegate) must find that the local agency has met certain local responsibilities before authorizing a contract for a loan or capital grant. The Secretary's determination is to be based upon his review of a "workable plan for community improvement" submitted by the local public agency. 42 U.S.C. § 1451(c). That "workable plan" must be "of sufficient scope and content to furnish a basis for evaluation of the need for the urban renewal project". 42 U.S.C. § 1451(e).

Additionally, Congress has specified that the contracts for loans and grants must include certain requirements. 42

U.S.C. § 1455. Particularly relevant to this case is the requirement that there be a "feasible method for the temporary relocation of individuals and families displaced from the urban renewal area"; and further, that "decent, safe, and sanitary dwellings" as desirable as the homes within the project are or soon will be available to all of the displaced individuals and families. 42 U.S.C. § 1455 (c) (1). Furthermore, the Secretary must require "within a reasonable time prior to actual displacement, satisfactory assurance by the local public agency" that such relocation facilities are available for each individual and family. 42 U.S.C. § 1455(c) (2).

Congress has also provided that:

"Notwithstanding any other provision of this subchapter,

(A) No contract shall be entered into for any loan or capital grant under this subchapter for any project which provides for demolition and removal of buildings and improvements unless the Administrator [Secretary] determines that the objectives of the urban renewal plan could not be achieved through rehabilitation of the project area * * *" 42 U.S.C. § 1460(c).

The total cumulative effect of these and other provisions of the Housing Act is to establish certain specific federal requirements for urban projects which must be satisfied if federal financing is to accomplish the Congressionally declared goal of "a decent home and a suitable living environment for every American family." Furthermore, the statutory provisions place the responsibility for determining whether these requirements have been satisfied upon the Secretary or his delegates. Thus the Secretary, who must bear this essential decisional responsibility, is the primary guardian of the planning values established by Congress.

B. *Judicial Review*

In support of their motion to dismiss, the defendants argue that the Secretary's decisions on federal grants under the National Housing Act are not subject to judicial review. In effect, they contend that no one can challenge the Secretary's decision that a particular urban project satisfies all the prerequisites of the Housing Act.

The Administrative Procedure Act provides that "[a] gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The Secretary's decision to authorize funds for the challenged University City project is a "final agency action"; nor is there any remedy adequate other than judicial review of the contested agency action.[5]

5. It must be remembered that the plaintiffs' complaint rests primarily on the Secretary's allegedly illegal failure to afford the plaintiffs an appropriate procedural opportunity to demonstrate the ineligibility of the project for a grant under the Housing Act. This procedural deprivation is one of the "agency actions", or inactions, which the plaintiffs complain of. We believe that only federal judicial review could provide the plaintiffs with an adequate remedy for the Secretary's alleged failure to provide procedural rights implicitly guaranteed by the Housing Act and by the federal constitution. The defendants have contended that the plaintiffs have an adequate remedy at law in the state courts under Section 406 of the Pennsylvania Eminent Domain Code of 1964, 26 P.S. § 1–406. If the plaintiffs were challenging the state's power of eminent domain, if they sought injunctive relief against the state or against the Philadelphia Redevelopment Authority, then the defendants' argument might be more persuasive, as it apparently was in Harrison-Halstead Community Group, Inc. v. Housing and Home Finance Agency, 310 F.2d 99 (7th Cir. 1962) and in Green Street Ass'n. v. Daley, 373 F.2d 1 (7th Cir. 1967). However, in contrast to those Seventh Circuit decisions, the plaintiffs here seek no relief against the state or against the local public agency; nor do they seek to enjoin acquisition of the properties within the urban project. They merely request injunctive relief preventing federal funds

Thus, despite the fact that the Housing Act does not explicitly make the Secretary's decisions subject to judicial review, the Administrative Procedure Act would appear to render those decisions reviewable. The Supreme Court has held that the Administrative Procedure Act establishes a presumption in favor of judicial review, so that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the court restrict access to judicial review." Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 1511, 18 L. Ed.2d 681 (1967); Rusk v. Cort, 369 U.S. 367, 379–380, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962). See also Jaffe, Judicial Control of Administrative Action, 336–359 (1965). It is clear that the absence of a specific provision for review in the Housing Act is not to be considered evidence of any congressional intent to preclude review. See H. R. Rep. No. 1980, 77th Cong., 2d Sess., 41 (1946), cited in Abbott Laboratories v. Gardner, supra, 387 U.S. at 140, n. 2, 87 S.Ct. 1507; Road Review League Town of Bedford v. Boyd, 270 F.Supp. 650, 659 (S.D.N.Y. 1967); Cappadora v. Celebrezze, 356 F. 2d 1 (2d Cir. 1966). The defendants cite no legislative history evidencing any congressional intent to make the Secretary's decisions wholly unreviewable, nor have we been able to find any such evidence.

The defendants nevertheless maintain that the presumption of judicial review codified by the Administrative Procedure Act is overcome by the inherent unreviewability of urban planning policy decisions. The argument carries little merit in this case, where the plaintiffs primarily contend that the Secretary simply misunderstands the procedural requirements implicit in the Housing Act. The Court is merely asked to review the procedural implications of a federal statute, not the substantive merit of a planning policy

decision. Whether the Secretary was "correct" in determining that the particular project satisfied federal planning requirements is a question not properly before the Court at this time, and thus we need not express an opinion upon the reviewability of that determination. Should we decide finally that the plaintiffs are not entitled to the procedural relief which they primarily request, or should they receive such procedural relief, fail to persuade the Secretary on their position, and then challenge the Secretary's decision before this Court, we would be compelled to determine the reviewability of the Secretary's substantive planning decisions; until that time, any argument of "inherent unreviewability" is prematurely presented and misconceives the nature of the plaintiffs' primary procedural basis for relief.

### C. *Standing*

Intertwined with the defendants' contentions that the Secretary's decisions are unreviewable is the related argument that the plaintiffs lack the necessary standing to secure judicial review. The Administrative Procedure Act provides that any person "aggrieved by agency action within the meaning of a relevant statute" may obtain judicial review of that action. 5 U.S.C. § 702. We believe that the plaintiffs qualify under the terms of the Act as defined by the case law and thus do have standing to contest alleged violations of the National Housing Act.

The defendants maintain that the National Housing Act merely provides for a subsidy grant-in-aid relationship between the federal government and the local public authority; and that the Act confers no judicially cognizable legal rights on the residents of the affected renewal sites.

■ Even if we accepted the defendants' proposition that the Housing Act

---

from being disbursed by a federal officer of a federal agency until the officer has complied with the alleged federal procedural requirements of a federal statute.

No remedy other than federal judicial review could be considered either adequate or appropriate.

confers no substantive legal rights on the residents of affected sites, we would nevertheless conclude that the plaintiffs have standing to raise procedural issues. The plaintiffs have alleged that the Secretary has failed to comply with procedures demanded implicitly by the Housing Act and by the Constitution. Even if the plaintiffs had no legal right to challenge the substantive correctness of the Secretary's decisions on federal grants, they would be entitled to challenge the propriety of the Secretary's decisional procedures. See, e. g., Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964); Gart v. Cole, 263 F.2d 244 (2d Cir. 1959).

However, we are of the opinion that the plaintiffs also have standing in the more traditional sense: they have substantive legal rights conferred by the National Housing Act. They have private individual legal rights; and they are the appropriate representatives of legal rights conferred by the Housing Act on the general public.

The Housing Act specifically recognizes the interest of each project site resident in securing adequate relocation facilities. Title 42 U.S.C. § 1455(c) (1) specifies that any contract authorized by the Secretary for federal funds shall require as follows:

"There shall be a feasible method for the temporary relocation of individuals and families displaced from the urban renewal area, and there are or are being provided, in the urban renewal area or in other areas not generally less desirable * * * decent, safe, and sanitary dwellings * * *."

The provision additionally requires that relocation dwellings must be adequate in number, within the displaced person's financial means, and reasonably accessible to their places of employment. Thus Congress has clearly recognized the relocation interests of individuals and families within the project site, and has even made the availability of federal funds

conditional upon the local authority's ability to provide satisfactory relocation facilities. The contract for federal funds is required to recognize and to protect the residents' relocation interests.

Additionally, the Housing Act explicitly orders the Secretary of HUD to assure that the relocation interests recognized in the contract will in fact be adequately protected.

"[T]he Administrator [Secretary] shall require, within a reasonable time prior to actual displacement, satisfactory assurance by the local public agency that * * * dwellings as required * * * are available for the relocation of each such individual or family."

42 U.S.C. § 1455(c) (2). The Secretary is the guardian of the displaced families' interests. From the statutory framework, it is clear that the Secretary cannot properly authorize disbursement of federal funds unless the relocation interests will be adequately protected.

The plaintiffs in this action allege generally that adequate relocation facilities are simply non-existent in Philadelphia, and that therefore the Secretary should not have entered the grant-in-aid contract with the Philadelphia Redevelopment Authority. Essentially, they claim that their interest in relocation, as recognized by the Housing Act and by the grant-in-aid contract itself, cannot possibly be served as required by the statutory provisions; and that the Secretary has arbitrarily concluded otherwise by signing the grant-in-aid contract. Additionally, they contend that the Secretary, who is specifically required to determine the adequacy of relocation facilities, cannot make that determination fairly or rationally unles he affords the prospective displaced citizens a procedural opportunity to demonstrate the inadequacy of the available relocation facilities; that the Secretary, who is required to make decisions which dramatically affect the plaintiffs' interests, is implicitly obliged by the Housing Act and by the Constitution to make rational and fair decisions,

which in turn implicitly require rational and fair decisional procedures. According to the facts alleged in the plaintiffs' complaint, the Secretary signed the grant-in-aid contract before allowing the complainants any procedural opportunity to demonstrate that the relocation provisions could not be satisfied.

The plaintiffs' economic interest in adequate relocation is obvious and beyond dispute. The provisions of the Housing Act recognize and seek to protect that interest. The Secretary of HUD has allegedly acted in disregard of the plaintiffs' recognized and protected interest. "When a party seeks judicial relief from an injury inflicted by administrative action upon an interest recognized by statute, standing and review traditionally obtain." Protecting the Standing of Renewal Site Families, 73 Yale L.J., 1080, 1084 (1964). See Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667 (1924). See also Kramer, The Place and Function of Judicial Review in the Administrative Process, 28 Fordham L. Rev. 1, 12 (1959). The plaintiffs' theory of relief fits the traditional formula. Particularly where, as here, the gravamen of the plaintiffs' complaint is that the Secretary has failed to provide implicitly required procedural machinery, the court should not abandon its institutional responsibility for assuring the procedural due process of agency actions. In the absence of an explicit congressional mandate, we believe it inappropriate to abdicate that responsibility in this case.

One Third Circuit case involving a cause of action under the National Housing Act provides indirect support for our conclusion that the plaintiffs do have cognizable legal rights and thus have standing conferred by the Housing Act provisions. In Merge v. Sharott, the plaintiffs had been compelled by a federally-financed redevelopment project to relocate their business concern. 341 F.2d 989 (3rd Cir. 1965). They claimed that the Secretary of the HHFA (now HUD), who had agreed in the grant contract with the local planning agency to pay all displaced citizens' reasonable moving expenses, had arbitrarily refused to compensate the plaintiffs for a substantial portion of their expenses.

The defendants argued that relocation payments under the Housing Act were not a matter of right but of congressional grace, and that the provision authorizing the Secretary to provide such payments did not confer legal rights on the intended beneficiaries of the payments.

The plaintiffs and the Court conceded that initially the Secretary had discretion under the statute whether to provide payment for relocation expenses. 341 F.2d 989, 993. However, the Court concluded that once the Secretary had exercised his discretionary authority by agreeing in the contract with the local agency to pay relocation expenses, then the Secretary's determination of the *amount* of the moving expenses must not be arbitrary or capricious; and that the plaintiffs had a legal right "created by Federal law and matured through the Title I contract" to contest the capriciousness of the Secretary's decision. 341 F.2d 989, 995.

In some respects, the *Sharott* opinion reveals a more liberal concept of standing than is required under the circumstances of this case. In *Sharott,* for example, the Housing Act *permitted* rather than *required* the Secretary to include provisions for relocation expense payments in the grant contract; whereas the Housing Act specifically and mandatorily requires that *every* such contract include the adequate relocation facilities provision. Thus it would appear that Congress was far more interested in having the Secretary assure that displaced citizens would be adequately relocated than in having the Secretary provide the displaced citizens with moving expenses. Second, in *Sharott,* the defendants could reasonably argue that federal payment of relocation expenses was really merely a subsidizing reimbursement benefit running solely to the local authority which made the actual payments; whereas in this case, it can hardly be contended that the contractually required availability of adequate relocation facilities is intended

to benefit anyone other than the prospectively displaced citizens. Of course, in both cases the plaintiffs' interests were specifically recognized and guaranteed by the federal grant contract; and, in both cases, the determination whether the plaintiffs' interests had in fact or would in fact be adequately protected was the Secretary's decisional responsibility.

The only significant distinctions between *Sharott* and the case sub judice which might arguably limit the plaintiffs' ability in this case to obtain judicial review of the Secretary's decision would appear primarily relevant to the concept of judicial reviewability; and we have already concluded supra (see Section II–B) that the Secretary's decision on the procedural prerequisites of relocation decisions is reviewable. As far as standing is concerned, the *Sharott* case appears to support our conclusion that the plaintiffs here do have standing. If a displaced citizen has a legal right "maturing" through the federal grant contract to challenge the "reasonableness" of the amount of the Secretary's moving expenses award, then he certainly should be found to have a legal right to challenge the "reasonableness" of the Secretary's conclusion on the adequacy of relocation facilities, or to challenge the "reasonableness" of the procedures employed in reaching that conclusion.

There are cases relied upon by the defendants which appear to support their contention that citizens living in the proposed project site have no legal rights and thus no standing under the National Housing Act. See, e. g., Green Street Ass'n v. Daley, 373 F.2d 1 (7th Cir. 1967); Johnson v. Redevelopment Agency, 317 F.2d 872 (9th Cir. 1963); Harrison-Halstead Community Group v. HHFA, 310 F.2d 99 (7th Cir. 1962); Valley Forge Golf Club v. Weaver, C.A. No. 43275 (E.D.Pa.1967); Norwalk Core v. Norwalk Redevelopment Agency, 42 F.R.D. 617 (D.Conn.1967). To the extent that those cases actually support the defendants' contentions, we respectfully disagree with their holdings. We note that the cases' conclusions on standing have been criticized both by recognized administrative law scholars ("[T]hese cases seem inconsistent with the theory * * * of protected legal interest; they probably reflect the difficulty of evaluating evidence on whether a proposed method of relocation is 'feasible'." Jaffe, Judicial Control of Administrative Action, 528–9, f. n. 97 (1965)), and by federal courts (See Road Review League Town of Bedford v. Boyd, 270 F.Supp. 650, 660 (S.D.N.Y.1967) (McLean, J.)). We prefer the construction of the Housing Act by the Second Circuit in Gart v. Cole, 263 F.2d 244, 250–251 (2d Cir. 1958), cert. denied 359 U.S. 978, 79 S.Ct. 898, 3 L.Ed.2d 929 (1959), where the court found that the plaintiffs did have standing to challenge the Secretary's procedure in granting funds.

However, despite the language in the referred-to cases which apparently supports the defendants' contentions on standing, we believe that the cases are factually distinguishable in several significant aspects. We cannot and will not attempt to explain away the conclusions on standing; but we do believe that the result in each case can be explained without reference to the standing issue and on grounds not present in the case sub judice.

In the *Green Street, Johnson, Harrison-Halstead* and *Norwalk* cases, the plaintiffs all attempted to obtain injunctive relief against both federal *and* state officials, restraining not only disbursement of federal funds, but also the construction and planning of the entire urban project. The basis for such relief was the alleged failure of the projects to meet the substantive planning requirements of the National Housing Act. In the *Norwalk* case, the court specifically concluded that "this Court does not have the equitable power to grant the extensive, almost dictatorial, redress requested." 42 F.R.D. 617, 621. In each of the cases, the courts observed that challenges to the state's eminent domain power should be presented to the state courts under available state procedures. Inso-

far as the plaintiffs sought injunctive relief against state officials, this conclusion would appear supportable.

In the present case, the plaintiffs do not request any relief against the state or the local public authority; they do not directly seek to enjoin the acquisition of their homes or the construction of the project. They assert only that the project cannot qualify for federal funds at this time without violating the plaintiffs' interests as recognized and protected by the National Housing Act. Relief is requested only against the federal government; should the state wish to proceed with the project without federal financial support, nothing in this law suit would prevent the state from so doing. Thus the relief here requested is far less sweeping in legal effect than that sought in the cases relied upon by the defendants.

Additionally, each of the above cases, including the *Valley Forge* decision, sought a permanent injunction requiring a review of the merits of the Secretary's decision that the projects were qualified. Judicial reluctance to intervene in the planning policy decisions of the Secretary is an understandable and recognized phenomenon; it arguably may merely reflect judicial awareness of the political sensitivity of the issues presented, and judicial hesitance in replacing the expert judgment of the Secretary with the presumably less expert judgment of the Court. See Mandelker, The Comprehensive Planning Requirement in Urban Renewal, 116 U.Pa.L.Rev. 25, 68 (1967).

However, in the present case, the primary relief requested by the plaintiffs does not require a review of the merits of the Secretary's decision. We are asked only to determine whether the Secretary has misconstrued the procedural prerequisites implicit in the Housing Act.[6] The determination does not require that the Court invade the Secretary's planning expertise domain; we are not asked to substitute our urban planning policy for his.

Finally, the injunctive relief which the plaintiffs here seek is actually conditional. Should we find that the plaintiffs have been illegally denied a procedural remedy and should we grant an injunction against disbursement of federal funds, the injunction would have compelling force only until the Secretary had granted the procedural relief illegally denied. Thus the injunction is not so "permanent" as an injunction predicated on a merits conclusion that the project could not qualify under the substantive prerequisites of the federal grant statute.

There are other significant distinctions between this case and those cited by the defendant. For example, in Johnson v. Redevelopment Agency, in addition to its observations on standing, the court noted that plaintiffs challenging the plan "may present their grievances, if any, to the Administrator, who is able to protect the interests of private individuals." 317 F.2d 872, 875 (9th Cir. 1963). The plaintiffs had failed to request the procedural opportunity which the plaintiffs here claim has been effectively denied by the Secretary. The court also cited the fact that the appellants had failed to appear at the local public hearing on the plan, and said that "absent protests, the Re-

---

6. In *Green Street* the plaintiffs did include among their contentions a claim that the local public hearing on the project plan was "inadequate" and did not conform to the requirements of 42 U.S.C. § 1455(d), and did request an injunction against all the defendants, both local and federal, which would restrain the defendants from carrying out the project until a "full and fair" hearing was held. The relief sought was, of course, far broader than the relief sought here. Nor

would it appear that the plaintiffs' claim had much merit, in light of the fact that they did appear at the hearing and did present a prepared statement. However, it cannot be denied that to the extent the court based its decision on the plaintiffs' lack of standing to raise the procedural issue, that decision is inconsistent with the rule of law applied in this case, in Gart v. Cole, supra, and in Road Review League Town of Bedford v. Boyd, 270 F.Supp. 650 (S.D.N.Y.1967).

development Authority had a right to assume that the plan was satisfactory. * * * The Agency has expended thus far over $2,000,000 in carrying out the project." Ibid. Finally, the court added that the plaintiffs had failed to take advantage of state court proceedings to attack the plan. Altogether, the court's opinion is heavy with criticism of the plaintiffs for their failure to exhaust available administrative and state remedies. Indeed, at least one commentator has noted that "the *Johnson* decision should be read as a limitation on site families' ability to obtain judicial review *only when they have neglected to seek relief in the administrative process.*" (Protecting the Standing of Renewal Site Families, 73 Yale L.J. 1080, 1097 (1964) (emphasis added).) In the case now before the Court, the plaintiffs' essential theory of action rests on their *right* to obtain procedural relief within the administrative process, a right which the *Johnson* case implicitly appears to recognize, despite the confusing and arguably contradictory discussion of standing.

In Harrison-Halstead Community Group v. HHFA, 310 F.2d 99 (1962), beyond the distinctions already discussed supra, the plaintiffs made no allegation that their interest in adequate relocation facilities under 42 U.S.C. § 1455(c) (1) or (2) had been affected by the Secretary's decision to grant funds. Nor were the relocation provisions at issue in Valley Forge Golf Club v. Weaver, supra, where the plaintiffs' action was grounded on the "Preservation of Open-Space Land" provisions of Title 42 U.S.C. § 1500 et seq., and where plaintiffs sought a substantive review of the Secretary's decision that the provisions had been satisfied. Furthermore, the *Valley Forge* case carried implications of the "available state remedy" factor which we have already concluded to be irrelevant in this case.[7]

In summary, we believe that the cases argued by the defendants in support of their standing argument are distinguishable in significant respects. The results in those cases can be explained on the basis that the courts considered the subject matter, i. e., the Secretary's substantive planning policy, not to be judicially reviewable; or on the basis that the plaintiffs had not attempted to exhaust available administrative or state remedies; or on the basis that the relief sought was inappropriately broad and all-inclusive. We do not find those issues presented in this case. However, to the extent that the results in those cases actually do depend on the courts' standing conclusions, we must respectfully disagree with these conclusions. Particularly where the plaintiff requires only that we determine the procedural prerequisites of a federal statute, where the administrative agency has allegedly denied the plaintiffs the procedural remedy sought, and where the scope of relief requested is appropriately narrow, we find no reason in law, logic, or policy to deny the plaintiffs the right to present their claim.

■ We have concluded that the relocation provisions of 42 U.S.C. § 1455(c) (1) and (2), both in their substantive and in their procedural implications, are intended for the protection of these particular plaintiffs and do provide standing in this case. However, we also believe that the plaintiffs have standing under the "private attorney general" concept, as that concept has been developed in Scenic Hudson Preserv. Conf. v. FPC, 354 F.2d 608 (2d Cir. 1965), cert. denied Consolidated Edison Co. of N. Y., Inc. v. Scenic Hudson Preservation Conf., 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966); Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966); and Road Review League Town of Bedford v. Boyd, 270 F.Supp. 650 (S.D.N.Y.

7. "This does not leave the plaintiff without remedy, since the essence of his grievance is that the condemnation action is invalid." Valley Forge Golf Club v. Weaver, C.A. 43275 at p. 4 (E.D.Pa. 1967).

1967). See also FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869. And in their capacity as "private attorney generals", the plaintiffs may raise issues not personal to them concerning alleged violations of provisions of the Housing Act other than the relocation provisions. See Scenic Hudson, supra, 354 F.2d at 619; Associated Industries of New York State, Inc. v. Ickes, 134 F.2d 694, 705 (2d Cir.), vacated as moot, 320 U.S. 707, 64 S. Ct. 74, 88 L.Ed. 414 (1943).

In the *Scenic Hudson* case, the Consolidated Edison Company of New York, Inc. had obtained a license from the Federal Power Commission ("FPC") to construct a pumped storage hydroelectric project at Storm King Mountain in Cornwall, New York. The plaintiffs, an unincorporated association consisting of several nonprofit, conservationist organizations, sought to have the FPC's order granting the license .set aside. The plaintiffs requested additional relief in the form of a procedural opportunity to adduce additional evidence before the FPC demonstrating that the license should not be granted for the particular project as it was then planned. In general terms, the plaintiff claimed that the planned project licensed was "not in the public interest."

The defendant, FPC, and the intervenor, Consolidated Edison, contended that the plaintiffs had no standing to obtain judicial review of the legality of the challenged license. They claimed that the plaintiffs were not an "aggrieved party" under the Federal Power Act's standing provisions,[8] essentially because the FPC's licensing order did not cause the plaintiffs any economic harm.

The court then undertook an analysis of the meaning of the term "aggrieved party" in the standing provision. Basically, the court determined what interests the statute ordered the FPC to pro-

tect, and what interests were "in the public interest", of which the FPC was to be the guardian.

The court concluded that the Federal Power Act recognized specific public interests in the preservation of aesthetically desirable, conservational, and recreational land sites; therefore, the FPC, in exercising its licensing function, must take particular care to protect those values. 354 F.2d 608, 615. In determining who could obtain judicial review of FPC orders allegedly inconsistent with these recognized interests, the court held that "those who by their activities and conduct have exhibited a special interest in such areas [conservation, etc.] must be held to be included in the class of 'aggrieved' parties." 354 F.2d 608, 616. The court concluded that the Scenic Hudson group, as plaintiffs, qualified as having exhibited such a "special interest" in conservation.

The import of the *Scenic Hudson* case is that neither economic injury nor a specific, individual legal right are necessary adjuncts to standing. A plaintiff need only demonstrate that he is an appropriate person to question the agency's alleged failure to protect a value specifically recognized by federal law as "in the public interest"; he may then invoke judicial scrutinization of the agency's performance in protecting—or in failing to protect—that specific value. He has standing to ask whether the agency action is violative of the public interest. See also Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966).

To apply the *Scenic Hudson* analytical technique to the instant case, it is necessary first to review the interests which the National Housing Act seeks to protect. The first provision of the Act declares that the agency is to exercise all

---

8. Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), reads:

"(b) Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located * * *."

of its powers, duties, and functions consistently with the goal of constructing "a decent home and a suitable living environment for every American family." 42 U.S.C. § 1441. The statutory scheme proceeds to spell out in considerable detail the interests which the agency must consider in attempting to achieve that declared objective. For example, the project is to be part of a comprehensive, sound, workable, local plan, 42 U.S.C. § 1451(c); the possibility of rehabilitation must be considered, and is expressly preferred above demolition unless rehabilitation would frustrate the objectives of the renewal plan, 42 U.S.C. § 1460(c) (9); and, of course, adequate relocation facilities must be available for displaced families and individuals, 42 U.S.C. § 1455(c) (1).

These, then, are some of the specific values which the Congress has declared to require protection if the public interest in federally-financed housing is to be served. The Secretary, in determining whether federal funds should be granted, must take care to protect these values. The plaintiffs in this case claim that the Secretary, in granting funds for the University City project, has incorrectly concluded that the project plans will protect the values declared by the Housing Act; and further, has failed to adopt the appropriate and required procedures for determining whether the values will be so protected.

The Administrative Procedure Act (5 U.S.C. § 702) entitled a person who is "aggrieved by agency action within the meaning of a relevant statute" to obtain judicial review of that action. The question, then, is whether the plaintiffs in this case are a party "aggrieved" within the meaning of the National Housing Act. According to the *Scenic Hudson* opinion, a party must be considered "aggrieved" if, by his conduct and activities, he has demonstrated "special interest" in the values recognized and pro-

tected by the relevant statute.[9] 354 F. 2d 608, 616. With respect to the above discussed statutory values of workable, sound, comprehensive local planning for the project, rehabilitation, and relocation, no one could have a more "special interest" than the citizens whose homes will be acquired and razed by the federally-financed project. Indeed, as far as the rehabilitation and relocation provisions are concerned, we can imagine no one *other* than residents within the proposed project who would have any actual interest in assuring the protection of these values. The plaintiff, Powelton Civic Home Owners Association, is certainly an adequate and appropriate representative of those citizens' interests. If the public interest in these values is to be protected, the voices of those most dramatically affected by disregard of the values must be heard. If the residents in the project site have no standing to raise these issues "in the public interest", then, for all practical purposes, no one has standing, and the Secretary's determinations would be virtually immune from judicial review. As we have already concluded in Section II–B of this opinion, such result would neither be consistent with the presumption of judicial review by the Administrative Procedure Act, 5 U.S.C. § 704, nor specifically authorized by the National Housing Act.

We note that our conclusion that the plaintiffs also have standing under the "private attorney general" concept is buttressed strongly by a very recent federal court decision construing the Federal Highways Act, 23 U.S.C. § 101 et seq. See Road Review League Town of Bedford v. Boyd, 270 F.Supp. 650 (S.D.N.Y.1967). The Highways Act is similar to the Housing Act in that it is basically a federal grant-in-aid provision. The highway routes are selected, planned, constructed, and owned by the state applying for federal aid. However, in order for the state to obtain

---

9. Of course, the *Scenic Hudson* court was defining "aggrieved" as that term is used in the Federal Power Act. However, we see no reason to give a different definitional standard to the same term as used in the Administrative Procedure Act. See Road Review League Town of Bedford v. Boyd, 270 F.Supp. 650, 661 (S.D. N.Y.1967).

féderal funds, the Federal Highway Administrator and the Secretary of Commerce must approve the state's proposed plans.

In *Road Review League,* supra, the plaintiffs were property owners whose property would be damaged by the state's proposed highway routes and a non-profit civic organization specially concerned with the aesthetic and conservational desirability of highway locations. Their right to relief rested on the contention that the federal officers approving the state plans had acted arbitrarily and capriciously in violation of the Highway Act. The defendants moved to dismiss the complaint on the grounds that the federal officers' decision was absolutely unreviewable and that the plaintiffs had no standing under the Highway Act. The Highway Act contained no provisions on either standing or judicial review. As in this case, the plaintiffs claimed reviewability and standing under the Administrative Procedure Act.

The court denied the defendants' motion to dismiss and proceeded to review the merits of the federal officers' decision. In ruling upon the plaintiffs' standing, the court specifically considered the cases relied upon by the defendants in this action which have held that site residents have no standing under the National Housing Act. Judge McLean observed that:

"I have based my decision upon the implications * * * of the recent decision of the Court of Appeals in Scenic Hudson * * *. Under the law as it stood prior to that decision, it may well be that these plaintiffs do not have the necessary standing. See Green Street Assn. v. Daley, 373 F.2d 1 (7th Cir. 1967); Berry v. Housing and Home Finance Agency, 340 F.2d 939 (2d Cir. 1965); Harrison-Halstead Community Group Inc. v. Housing and Home Finance Agency, 310 F.2d 99 (7th Cir. 1962); cert. denied 373 U.S. 914, [83 S.Ct. 1297, 10 L.Ed. 2d 414] (1963); Gart v. Cole, 263 F. 2d 244 (2d Cir. 1959),[10] cert. denied, 359 U.S. 978, [79 S.Ct. 898, 3 L.Ed.2d 921] (1959). Scenic Hudson may have changed that law in cases like the present one."

270 F.Supp. 650, 660. The court then refused to follow the *Green Street* approach, as do we in the case sub judice. Instead, having found that the Highway Act provisions required the federal officers to consider local needs and to preserve parks and historic sites as far as feasible, the court concluded that:

"[T]hese provisions are sufficient, under the principle of *Scenic Hudson,* to manifest a congressional intent that towns, local civic organizations, and conservation groups are to be considered 'aggrieved' by agency action which allegedly has disregarded their interests."

270 F.Supp. 650, 661. We have similarly concluded that the provisions of the National Housing Act recognizing and protecting the values of rehabilitation, relocation and integrated local planning manifest a congressional intent that non-profit civic organizations representing the citizens who will be displaced by the proposed project are to be considered "aggrieved" by agency action allegedly disregarding their interests.[11]

10. In Gart v. Cole, supra, the Second Circuit did conclude that the plaintiffs at least had standing to raise procedural questions. 263 F.2d 244, 250. The court did not decide whether the plaintiffs had standing to challenge the merits of the Secretary's decisions, or whether such decisions could ever be judicially reviewable.

11. The courts in *Scenic Hudson,* supra, and in Office of Communication of United Church of Christ v. FCC, 123 U.S.App. D.C. 328, 359 F.2d 994 (1966), each noted

that their liberalized concepts of standing would not really expose the agencies to "thousands" of law suits. The courts noted that the expense and vexation of legal proceedings is not lightly undertaken. The plaintiff, of course, must also be a legitimate representative of the public interest. Representation of common interests by a group such as the Powelton organization was described by the *Scenic Hudson* court as a means for expediting the administrative process.

## D. *Plaintiffs' Right to Relief*

We have concluded that the Secretary's decision not to grant the plaintiffs their requested procedural relief is reviewable; and that the plaintiffs have standing to challenge alleged violations of the National Housing Act. However, in their motion to dismiss, the defendants further maintain that neither the Housing Act nor the Constitution provide the specific procedural and substantive rights claimed by the plaintiffs. Because the defendants have filed motions to dismiss rather than answers to the plaintiffs' complaint, we cannot at this time determine the plaintiffs' final right to any specific relief. However, we can determine what relevant rights are guaranteed by the statute and by the Constitution; and, when the defendants file their answers, we will determine whether this particular group of plaintiffs is entitled to those rights on the facts of this case.

· The plaintiffs claim that the Secretary must grant them an adjudicatory hearing on the various violations of the Housing Act alleged in their complaint, as provided by the Administrative Procedure Act. See 5 U.S.C. § 554. The Administrative Procedure Act provides adjudicatory hearings only "in every case of adjudication *required by statute* to be determined on the record after opportunity for an agency hearing." Ibid. (Emphasis added) No provision of the Housing Act explicitly requires adjudicating hearings before the Secretary; nor do we believe it appropriate to conclude that adjudicatory hearings are implicitly required either by the Housing Act or by constitutional due process.

■ In attempting to evaluate the implicit procedural requirements of the statute, it is important to ascertain the nature of the decisions made by the Secretary: do his decisions require factual findings on the particular status of a particular individual? or do the decisions rest on more general findings requiring analysis and evaluation of factors not uniquely related to any specific individual? The distinction has been described as the difference between "adjudicatory" and "legislative" fact finding. See Davis, Administrative Law, § 7.02 at p. 413 (1958). Compare Londoner v. City & County of Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908) with Bi-Metallic Inv. Co. v. State Bd. of Equalization, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915). The former generally requires an adjudicatory hearing; the latter generally does not.

■ We are of the opinion that the Secretary, in determining whether a particular project satisfied the requirements of the Housing Act, is engaged in a "legislative" fact-finding process, and that therefore the plaintiffs have no right, either explicit or implicit, to an adjudicatory hearing before the Secretary. For example, in deciding whether the project area should be rehabilitated rather than razed, the Secretary's decision must be based upon his evaluation of the entire project area, rather than upon the status of any particular home. See 42 U.S.C. § 1460(c) (8). In determining the availability of satisfactory relocation facilities, the Secretary's inquiries will be directed towards the ascertainment of general statistical facts: what are the general conditions in the area housing market? what are the competing demands from other housing consumers? what are the general needs of the displaced families? See Protecting the Standing of Renewal Site Families, 73 Yale L.J. 1080, 1091–2 (1964). See also Address by Robert C. Weaver, "Successes and Failures of Urban Development in England and the United States", The Record 493, 496–7 (Oct. 1965). The peculiar problems of one individual or of one family within the project site will not be very relevant to the Secretary's determination.

Of course, as a practical matter, adjudicatory hearings would not be at all feasible. If every individual homeowner and tenant to be displaced by a federally-financed redevelopment project could

demand an adjudicatory hearing before the Secretary on alleged violations of the relocation provisions, the burden on the agency would be impossibly overwhelming.

Nor would it appear that the traditional accoutrements of an adjudicatory hearing would be very useful to the plaintiffs. For example, the usual value of such a hearing lies in the parties' ability to make oral argument; to confront and to cross-examine the opposition's witnesses; and to demonstrate demeanor evidence. None of these devices would be very relevant or effective in attempting to demonstrate to the Secretary that a particular neighborhood should be rehabilitated rather than razed, or in persuading the Secretary of the inadequacy of relocation facilities.

■■■ Unquestionably, the effect of the Secretary's decision may dramatically affect an individual or a family within the project area. However, it is the nature of the decision's fact-finding process, not the ultimate effect of the decision, that determines the party's right to an adjudicatory hearing. The statute here is silent; the essential facts to be found are "legislative"; the burden on the Secretary would be enormous; and the utility of an adjudicatory hearing is dubious. Thereafter, we conclude that the plaintiffs have no implicit right to an adjudicatory hearing before

the Secretary either under the Housing Act or under the Constitution.[12]

■■■ Nor do we believe that the plaintiffs are entitled to demand a so-called "legislative" hearing before the Secretary. Certainly the Housing Act itself does not explicitly provide for such a hearing. Indeed, since the Act does specifically require the local public agency to conduct a public hearing before acquiring land for a federally-financed project, 42 U.S.C. § 1455(d), it might be argued that the absence of a provision requiring a hearing before the Secretary is indicative of a congressional intent that no such hearing should be available. Nor does the Administrative Procedure Act on "Rule Making" assist the plaintiffs' argument. See 5 U.S.C. § 553. First, the rule making provisions do not apply to agency proceedings involving "loans, grants, benefits, or contracts." 5 U.S.C. § 553(a) (2). Second, the provisions, when applicable, merely require that "interested persons" be given an "opportunity to participate * * * with or without opportunity for oral presentation." 5 U.S.C. § 553(c). Thus a hearing is necessary only when it would serve some valid purpose. We do not believe that a hearing would facilitate fairer or more informed decisions on the kinds of issues presented by plaintiffs under the National Housing Act.

However, the demands of due process do imply that the plaintiffs should be

---

12. The Second Circuit also concluded that the plaintiffs were not entitled to an oral adjudicatory hearing under the Housing Act in Gart v. Cole, 263 F.2d 244, 251 (1959). The court noted that the right to an adjudicatory hearing should not be implied where "the purpose of the proceeding is to determine the compliance with federal standards of a general plan for the relocation not of individuals, but of a group within a geographically defined area." Ibid. The plaintiffs argue that the relocation provision was amended subsequent to Gart and has elevated the relocation right to an individual right, because the Secretary now is obliged to obtain assurance from the local public agency that adequate relocation is available for each individual and each family. 42 U.S.C. § 1455(c) (2). The argument is unpersuasive. The amendment apparently merely requires the local public agency to submit materials to the Secretary showing that adequate relocation facilities will indeed be available, as required by 42 U.S.C. § 1455(c) (1). We do not understand how this requirement could be construed to authorize adjudicatory hearings on the relocation issue. The requirement certainly does not change the nature of the fact-finding determinations to be made by the Administrator; these determinations remain "legislative" in character, and thus do not necessitate adjudicatory procedures.

afforded an appropriate procedural opportunity to present their claims to the Secretary. Of course, if that opportunity is to be adequate or meaningful, it must be made available prior to the Secretary's decision to authorize federal funds for the challenged project. It appears that on September 11, 1967 the plaintiffs requested Secretary Weaver to delay authorization of federal funds until they had been allowed an opportunity to submit "further documentation and exhibits" supporting the allegations in their complaint, Plaintiffs' Complaint, Exhibit "A", and that Secretary Weaver, by entering into a contract with the Philadelphia Redevelopment Authority on September 18, 1967, without allowing the plaintiffs such procedural opportunity, impliedly denied the requested procedural relief. See Plaintiffs' Complaint, p. 5. Assuming the facts alleged in the plaintiffs' complaint to be true for the purpose of deciding the defendants' motions to dismiss, the question is whether the plaintiffs were entitled as a matter of right to submit written and documentary evidence to the Secretary before he determined the eligibility of the redevelopment project for federal funds.

As we have already observed, the responsibility for deciding whether a particular local project adequately protects statutorily recognized public and private interests rests upon the Secretary; he is to determine whether the project plans meet the requirements of the Housing Act. It is clear that in this case, and in most if not all cases, the Secretary's decision is based upon evidence, information, and conclusions contained in written data prepared and submitted by the local public agency (e. g. the Philadelphia Redevelopment Authority). Nowhere does the Housing Act explicitly require the Secretary to consider the views or claims of anyone other than the local public agency; nor does the Housing Act require the local agency to include any viewpoint or contentions other than its own in the materials submitted to the Secretary. Yet it is beyond argument that if the Secretary is statutorily obliged to make decisions on the project's compliance with federal prerequisites, then he is implicitly obliged by due process to make fair, non-arbitrary decisions. It has been observed that if the Secretary fails to adopt procedures which would expose him to viewpoints other than those of the local agency, his decision is inherently susceptible to a due process attack:

"[O]nce the Administrator [Secretary] has elected to base his determination primarily on data submitted by the LPA [local public authority]—rather than on independent HHFA [HUD] investigations or on the record made at the local hearings—it would seem that he must consider proffered protests to that data. Otherwise, his determination can be based only on those facts which the LPA has chosen to submit, and will be susceptible to attack as arbitrary or as an abuse of discretion."

Protecting the Standing of Renewal Site Families, 73 Yale L.J., 1080, 1090 (1964). It would appear that, on at least one occasion, the Housing Agency has recognized the site residents' right to submit documentary evidence contesting the local authority's plan, see Gart v. Cole, 263 F.2d 244, 250–251 (1959); and, on at least one other occasion, the courts have suggested that "parties * * * in the process of being relocated may present their grievances, if any, to the Administrator, who is able to protect the interests of private individuals." Johnson v. Redevelopment Agency, 317 F.2d 872, 875 (9th Cir. 1963).

From the plaintiffs' complaint, it would appear that in this case, the Secretary has based his determination primarily on data submitted by the Philadelphia Redevelopment Authority. If the Secretary's decision is to be truly protective of the public and private interests recognized by the Housing Act, he must afford the plaintiffs an opportunity equal to that available to the Redevelopment Authority to submit written and docu-

mentary evidence on the legality of the plan. We would not attempt to substitute our planning judgment for that of the Secretary; but we do believe that the Secretary must base his decisions on a complete record expressing the views of all recognized interests *if he is to fulfill his planning function under the Housing Act.*

Our decision is supported by the modern trends evidenced in the *Scenic Hudson* and *Road Review League* cases. That trend is well founded on valid policy considerations. It has been observed that procedural rights which facilitate citizen participation in governmental decision-making lead to more effective, more acceptable substantive planning determinations:

> "[P]rocedure carries its own virtues. It can make certain that all points of view are heard. It can ventilate the decision-making process by exposing it to the light of day and thus make some forms of abuse more difficult. It can force an agency to spell out reasons for a decision which serve both as a check upon agency process and as a basis for judicial review."

Reich, *The Law of the Planned Society,* 75 Yale L.J., 1227, 1240 (July, 1966). Professor Reich has also noted that "if we cannot guarantee the 'right' decisions, we can perhaps insure that more decisions are made by the right processes." Id. at 1251. Compelling the agency to build a more complete record is certainly one method of insuring the "right processes", as the *Scenic Hudson* case clearly demonstrates.[13]

Finally, we do not believe that HUD will be unreasonably burdened by the obligation to make this limited procedural opportunity available to the residents of the project site. Indeed, as the Gart v. Cole case indicates, the Secretary has offered this opportunity on occasion in the past. *After* he had already signed the grant-in-aid contract, the Secretary offered the plaintiffs in this instant case an opportunity for informal discussions with the HUD Regional Administrator, which would seem a more burdensome procedure than allowing plaintiffs to submit documentary evidence *before* the Secretary makes his decision. The latter procedure would appear to create minimal interference with the effective administration of the national housing program, while assuring the minimal protection of the plaintiffs' interests required by due process.

### III. *Service of Process upon the Secretary*

Defense counsel further contend that the Secretary has not legally or adequately been served with process and that therefore the action as to the Secretary must be dismissed. Essentially, the defendants argue that the Secretary's location in Washington, D. C., places him beyond the territorial limits of the forum state and thus beyond effective service as provided by Rule 4(f) of the Federal Rules of Civil Procedure.

Rule 4(f) provides that process may be served effectively beyond state territorial limits whenever expressly authorized by federal statute. In 1962, in response to plaintiffs' difficulties in obtaining effective service on the officers of federal agencies, Congress enacted a venue/service provision declaring that:

> "A civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of any legal authority, or an agency of the United States, may, except as otherwise provided by law,

---

13. In his perceptive article, Professor Reich has advanced the intriguing if undeveloped proposition that citizen participation in governmental planning decisions should be protected under the first amendment. Simply explained, "free" speech means "free" expression; "free" expression requires "effective" expression; and "effective" expression in this context requires adequate procedural participation in the government's decision-making process. It is the citizen's only means of "reaching" his government "effectively". See Reich, supra, at 12.

be brought in any judicial district in which \* \* \* (4) the plaintiff resides if no real property is involved in the action.

The summons and complaint in such an action shall be served as provided by the Federal Rules of Civil Procedue except that the delivery . . . to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district within which the action is brought."

28 U.S.C. § 1391(e).

The plaintiffs rely on Section 1391(e) as authorization for effective service on Secretary Weaver in this action. The defendants argue that the provision is not applicable because it requires that each defendant be an officer or employee of a federal agency. The plaintiffs have named the Philadelphia Redevelopment Authority, a local non-federal agency, as a party defendant.

The defendants' argument, though arguably supported by the literal language of Section 1391(e), is inconsistent with the apparent spirit and intent of the provision. Section 1391(e) is essentially a plaintiffs' provision. Plaintiffs suing federal officers need no longer travel to the District of Columbia to institute their action. Nor are such plaintiffs now "whipsawed" out of a cause of action by mutually excluding venue and service of process provisions.[14] Section 1391(e) attempts to remove the virtually impenetrable barrier of procedural entanglement which has so frequently provided the government with de facto immunity from law suits.

The defendants' construction of Section 1391(e) would resurrect the illogical procedural limitations which the provision sought to bury. The plaintiffs have named a local, nonfederal agency as a defendant. The defendants claim that therefore Section 1391(e) is not applicable; they offer no reason for this result beyond the literal language of the statute. If the defendants are correct in contending that we should merely *read* rather than *construe* the statute, and if the Philadelphia Redevelopment Authority is an indispensable party, then Section 1391(e) has failed to protect the plaintiffs from the "Whipsaw" effect already described. It is clear that the Secretary is indispensable to the plaintiffs' claim for relief; yet if the plaintiffs should attempt to sue the Secretary in Washington, D. C., the venue would be improper and the theoretically indispensable Philadelphia Authority could not be effectively served. Despite the apparent intent of Section 1391(e), the Secretary would once again have achieved a procedural de facto immunity.

Since the consequence of the defendants' argument is so inconsistent with the apparent intent of Section 1391 (e), we believe it is appropriate to look beyond the literal language of the provision; and we conclude that the requirement that "each defendant" be a *federal* defendant refers only to defendants who are *beyond* the forum's territorial limits. Thus the joining of a non-federal defendant located within the forum's territorial limits and adequately served under F.R.Civ.P. 4(f) has no effect on the applicability or operation

14. The "whipsaw" effect occurs when the venue of a plaintiff's action clearly lies in Jurisdiction A, and two indispensable federal defendants reside respectively in Jurisdiction A and Jurisdiction B. Under F.R.Civ.P. 4(f), the plaintiff could never obtain effective service of process in Jurisdiction A over the indispensable defendant in Jurisdiction B. However, in Jurisdiction B, the plaintiff would be equally unable to serve effectively the defendant in Jurisdiction A; and further, the venue in Jurisdiction B would be improperly laid. Section 1391(e) seeks to alleviate the hardship created by Rule 4(f) by authorizing extraterritorial service of process whenever the indispensable defendant beyond the forum territorial limits is a federal officer. See 2 Moore's Fed. Practice, ¶ 4.29 at 1209–1210 (1966).

of Section 1391(e). Indeed, any other conclusion would appear entirely illogical. Section 1391(e), as an exception to Rule 4(f), is an authorization of extraterritorial service of process. Its force begins to operate only when Rule 4(f) cannot provide adequate service. It would be absurd to conclude that the operative force of the provision is abrogated by the presence of an additional defendant who can be adequately served within the power of Rule 4(f). The presence of parties who can be and have been served under Rule 4(f) is simply not relevant to the extra-territorial operation of Section 1391(e).

Additionally, the Philadelphia Redevelopment Authority is clearly not an indispensable party in this action. The plaintiffs do not seek any relief against the Authority, nor is the cooperation of the Authority necessary to any relief sought from the Secretary. The plaintiffs claim that they have named the Authority as defendants merely as a gesture of courtesy, in order to afford the Authority an opportunity to argue the issues from its point of view. Under the circumstances, had we concluded that the Authority's presence as defendant rendered Section 1391(e) inapplicable, we would have granted the plaintiffs' alternative request for an opportunity to amend their complaint by striking the Authority from the caption thereof.

## IV. *Sovereign Immunity*

The federal defendants also contend that this action is an unconsented suit against the United States, and is therefore barred by the doctrine of sovereign immunity. We find the argument to be without merit.

First, we have concluded that judicial review of the Secretary's alleged refusal to afford the plaintiffs adequate procedural relief is authorized by Section 10 of the Administrative Procedure Act, 5 U.S.C. § 702. Where applicable, Section 10 implies a comprehensive waiver of sovereign immunity in all actions otherwise sustainable against federal officers or agencies. See Mulry v. Driver, 366 F.2d 544, 547 (9th Cir. 1966); Estrada v. Ahrens, 296 F.2d 690, 698 (5th Cir. 1961); cf. Blackmar v. Guerre, 342 U.S. 512, 72 S.Ct. 410, 96 L.Ed. 534 (1952). See also Justice Frankfurter's majority opinion in Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 388–389, 59 S.Ct. 516, 517, 83 L.Ed. 784 (1939), which one commentator has described as having "solidified the idea that suability rather than immunity should be the assumption when a federal agency, rather than the United States itself, is the defendant." Hart & Wechsler, "Note on the Interpretation of Statutes Consenting to Suit", The Federal Courts and the Federal System 1161 (1953 ed.). For a comprehensive discussion of the sovereign immunity doctrine and its applicability to judicial review of federal grant-in-aid programs see Cahn, The New Sovereign Immunity, 81 Harv.L. Rev. 929 (March 1968).

Second, the National Housing Act specifically provides as follows:

"In the performance of, and with respect to, the functions, powers, and duties vested in him by this subchapter [Subchapter II], the Administrator, notwithstanding the provisions of any other law, may—

(1) sue and be sued."

42 U.S.C. § 1456(c). Among the "duties" of Subchapter II is the Secretary's obligation to determine the adequacy of relocation facilities, 42 U.S.C. § 1455(c) (1) and (2), and the implicit obligation to afford the plaintiffs an adequate procedural opportunity to demonstrate that the challenged project does not meet the requirements of Subchapter II. With respect to the Secretary's alleged failure to perform these duties, the Housing Act explicitly waives the sovereign immunity defense and consents to suit.

Third, the plaintiffs have alleged that the Secretary, in granting federal funds to the project before giving the plaintiffs the procedural relief requested, has failed to comply with the implicit procedural

requirements of the Housing Act and has thus exceeded the scope of his statutory and constitutional authority. The Secretary, of course, insists that the Housing Act does not require him to provide the plaintiffs with any procedural relief. The doctrine of sovereign immunity is simply not applicable to this kind of law suit. As has been observed by the United States Attorney General's Committee on Administrative Procedure,

> "While the Government enjoys sovereign immunity from suit, its officers do not share in that immunity. They are answerable, as private individuals, for wrongs committed even in the course of their official work * * *. To be sure, the officer may justify his conduct by referring to the law under which he is acting. But that raises precisely the issue whether the law does indeed authorize his conduct under the circumstances—the typical issue for judicial determination."

Administrative Procedure in Government Agencies, S.Doc. No. 8, 77th Cong., 1st Sess. 80–82 (1941); quoted in full and discussed in Byse, Proposed Reforms in Federal "Nonstatutory" Judicial Review: Sovereign Immunity, Indispensable Parties, Mandamus, 75 Harv.L.Rev. 1479, 1485 (1962). Thus this action may go forward even in the absence of any implied or explicit consent by the United States to be sued. See Abbott Laboratories v. Celebrezze, 228 F.Supp. 855 (D. Del.1964), aff'd sub nom. Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967). See also Dugan v. Rank, 372 U.S. 609, 621–622, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Malone v. Bowdoin, 369 U.S. 643, 647, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962); Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 56 L.Ed. 570 (1912); Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441 52 L.Ed. 714 (1908).

### V. Preliminary Injunction

■■ We have concluded that the National Housing Act does require the Secretary to afford the residents of project sites a procedural opportunity to submit written and documentary evidence before he determines the eligibility of the project for federal funds. Whether the Secretary has afforded the plaintiffs that opportunity in this case cannot be conclusively determined until the defendants have answered the factual allegations in the plaintiffs' complaint. However, in order to assure that whatever right the plaintiffs have in this particular case will not be rendered moot (and our jurisdiction thus lost) by the actual disbursement of funds to the local agency, we have found it necessary to issue a preliminary injunction restraining the Secretary and the federal agency from disbursing such funds to the Philadelphia Redevelopment Authority. We believe the issuance of the preliminary injunction to be justified by our conclusions that the plaintiffs have a probable right and that there is a probable danger that the right may be defeated unless the injunction is issued. The plaintiff is in substantial need of protection, and the possible damage to him, if the injunction is denied, plainly outweighs any foreseeable harm to the federal defendant enjoined. See also 7 Moore's Fed. Practice, ¶ 65.04, pps. 1625–1639 (1966).

### OPINION AND ORDER

On February 27 and 29, 1968, this Court entered an order and a supplementary order granting the plaintiffs in the above-captioned action a preliminary injunction restraining the federal defendants, Secretary Weaver and Regional Administrator Phelan, from disbursing funds to the Philadelphia Redevelopment Authority. The federal defendants have now filed a motion for reconsideration of our orders, and a motion requiring the plaintiffs to post twenty million dollars ($20,000,000.00) security under F.R. Civ.P. 65(c).

A. *Motion for Reconsideration:*

■ In the opinion of this Court, the plaintiffs' only cognizable claim to relief in this case was based on the alleged right to submit written and docu-

mentary evidence to Secretary Weaver and to have Secretary Weaver consider such evidence in determining whether the project planned by the Philadelphia Redevelopment Authority was eligible for federal funds under the National Housing Act of 1949, as amended, Title 42 U.S.C. § 1441 et seq.[1] The defendants move for reconsideration of the preliminary injunction on the grounds that, in light of the facts alleged in the plaintiffs' complaint, the plaintiffs' claim to such procedural relief is moot.

The salient facts as they are alleged in the plaintiffs' complaint are as follows:

On September 12, 1967, the plaintiffs filed a complaint with the Department of Housing and Urban Development ("HUD"), of which Robert C. Weaver is Secretary. Secretary Weaver was notified by a letter mailed on the previous day that the complaint had been filed. The letter requested that no funds be disbursed to the Philadelphia Redevelopment Authority until HUD had afforded the plaintiffs a hearing on their complaint. Plaintiffs also warned Secretary Weaver that "failure by the Department to act will force us to take the matter to the Federal Court." Exhibit A, p. 1, Plaintiffs' Complaint.

The complaint filed with HUD contained essentially the same factual and legal allegations brought before this Court, and was supported by a copy of a statement by a Powelton Civic Association spokesman protesting the University City Unit No. 5 project at a public hearing conducted by the City Council of Philadelphia. The complaint made three requests: (1) an opportunity to submit further documentation and exhibits in support of the complaint; (2) a prompt hearing on the complaint; and (3) a stay of disbursement of funds to the Philadelphia Redevelopment Authority until the aforementioned procedural relief had been granted and the Secretary's decision on the eligibility of the project

for federal funds had been made. Exhibit "A", p. 6, Plaintiffs' Complaint.

It is clear from the complaint that the plaintiffs desired an opportunity to convince the Secretary that the challenged project did not meet the requirements of the National Housing Act and thus would illegally infringe upon their rights as residents in the proposed project site. It is equally clear that the plaintiffs wanted that opportunity to be granted and realized before the Secretary made his decision on whether the project satisfied the Housing Act prerequisites.

However, on September 18, 1967, before answering the plaintiffs' complaint, HUD entered into a contract with the Philadelphia Redevelopment Authority and agreed to pay a substantial portion of the net project cost of University City Unit No. 5. See Plaintiffs' Complaint at p. 5.

On October 5, 1967, Secretary Weaver responded to the plaintiffs' complaint with a letter. He advised them that the National Housing Act did not provide citizen groups a right to a hearing before the Secretary. He further informed them that with respect to their contentions based on alleged violations of the Civil Rights Act of 1964, they had not exhausted their available administrative remedies, and that Regional Administrator Phelan would assist them in the formulation and presentation of a complaint, if they so desired. The letter did not notify the complainants that HUD had already signed the grant-in-aid contract with the Philadelphia Redevelopment Authority on September 18, 1967. Nor did Secretary Weaver respond to the plaintiffs' written request that they be allowed to submit further documentation and exhibits in support of their complaint before he decided whether funds should be granted. See Exhibit "B", Plaintiffs' Complaint.

On October 24, 1967, the plaintiffs again wrote Secretary Weaver and requested a reconsideration of his "ruling"

---

1. For a detailed discussion of the nature of the plaintiffs' rights under the National Housing Act, see our opinion in this case filed April 11, 1968.

in his letter of October 5, 1967. In the petition for reconsideration, the plaintiffs repeated their requests for an opportunity to submit further documentation and for a hearing, and once again prayed for a delay in the distribution of funds until the procedural relief requested had been granted and a decision by the Secretary then made. The plaintiffs apparently were still unaware that Secretary Weaver had *already* made his decision. See Exhibit "C", "Petition for Reconsideration", p. 1, Plaintiffs' Complaint.

On November 22, 1967, Secretary Weaver refused the plaintiffs' petition for reconsideration. He insisted again that neither the Housing Act nor the Administrative Procedure Act provided the plaintiffs a right to a hearing before the Secretary. He again offered the assistance of the Regional Administrator's office in formulating and presenting arguments and complaints, and also indicated that he would agree to arrange a conference in Washington for the plaintiffs with members of his staff. However, he did not inform the plaintiffs that the grant-in-aid contract had already been approved and signed. Finally, he noted that "the information which you have submitted is insufficient to warrant a stay in the distribution of funds * * *." Exhibit "D", Plaintiffs' Complaint.

The plaintiffs received Secretary Weaver's refusal of their petition for reconsideration on November `27, 1968. On the following day they filed their complaint in this Court requesting injunctive relief against Secretary Weaver and Regional Administrator Phelan until such time as the procedural relief requested had been granted. We granted a preliminary injunction restraining the federal defendants from disbursing funds to the Philadelphia Redevelopment Authority in order to protect our jurisdiction by preventing the issue in the case from becoming moot. We also granted the defendants' motion to dismiss with respect to all rights claimed by the plaintiffs save the alleged right to submit documentary evidence to the Secretary.

The defendants argue that Secretary Weaver, by advising the plaintiffs to present their complaints to the Regional Administrator's office and by offering review by his own staff, has already offered the plaintiffs the procedural opportunity which they seek in this action. Therefore, conclude the defendants, the issue of the plaintiffs' right to such procedural relief is moot, and the subject matter jurisdiction of this Court is destroyed.

The defendants' argument, though characterized as resting on considerations of mootness, actually appears to be predicated on the plaintiffs' alleged failure to take advantage of available administrative remedies. Implications of estoppel are also dimly adverted to. Neither of these defense theories were raised in the defendants' initial motion to dismiss, although the supportive relevant facts were equally apparent at that time. However, assuming that by liberal construction the defendants' motion is within the exceptions to waiver described in F.R.Civ.P. 12(h), we will rule on the merits of the contentions urged.

The basic proposition of the defendants' argument is that the Secretary already recognizes that the plaintiffs have the procedural right to submit documentary evidence under Title I of the National Housing Act. The defendants rely on the facts alleged in the plaintiffs' complaint to prove this proposition. We do not believe that those alleged facts offer the support which the defendants claim.

The plaintiffs are seeking to establish a procedural right whose exercise would *precede* the Secretary's decision on the eligibility of a redevelopment project for federal funds. Indeed, if the right is to be exercised effectively, its exercise always should precede that decision. The plaintiffs should not be obliged to convince the Secretary that he has made the wrong decision. The Secretary should not be allowed to make his decision be-

fore he has seen the plaintiffs' case. And, ordinarily, the local agency should not be exposed to the possibility that the Secretary may change his mind after reading the plaintiffs' evidence and rescind the grant already authorized. Fairness and efficiency demand that the fundamental procedural right be exercised prior to the Secretary's decision. Yet here, according to the allegations in the plaintiffs' complaint, the Secretary authorized the federal funds *after* HUD had received the plaintiffs' complaint and *before* he offered the services of the Regional Administrator. Implicitly he thereby denied the plaintiffs' request that procedural relief *precede* his decision, and precluded effective exercise of the plaintiffs' procedural rights.

Should the Court finally find that the plaintiffs' procedural rights have in fact been denied, a finding which we cannot make at this time because the defendants have not answered the relevant portions of the plaintiffs' complaint, then, in effect, we would have to "set aside" the Secretary's contractual authorization of the funds at issue and enjoin their disbursement to the Philadelphia Redevelopment Authority. Authorizing the funds without affording the plaintiffs an adequate, effective opportunity to exercise procedural rights implicitly guaranteed by the Housing Act and by the Constitution would exceed the Secretary's statutory authority. See Scenic Hudson Preserv. Conf. v. FPC, 354 F.2d 608 (2d Cir. 1965) (Court set aside FPC licensing order). The Secretary would then be required to allow the plaintiffs a reasonable period of time to submit their relevant documentary evidence. After considering the plaintiffs' evidence and the documents and exhibits from the Philadelphia Redevelopment Authority, he would then determine again whether the urban project at issue should receive federal funds under the Housing Act. Any final injunctive relief which this Court might have authorized would then automatically be dissolved.

Of course, there is no reason why the Secretary could not delegate the evidence-weighing function to this staff or to his Regional Administrator, if practicality so demanded. In fact, the procedure here suggested, which could be detailed and supplemented by administrative regulations, would appear less burdensome than the opportunity to appear before the Regional Administrator, which Secretary Weaver offered the plaintiffs in his letters included in the plaintiffs' exhibits. And by assuring that the plaintiffs' documentary evidence would be considered *before* the local agency's application for funds was ruled upon, HUD would afford the plaintiffs an adequate opportunity to exercise that procedural right effectively. From the facts alleged in the plaintiffs' complaint, we believe it clear that that opportunity has never been made available to the plaintiffs in this case.

Moreover, even had we concluded that the procedural right at issue could be exercised effectively after the Secretary had signed the grant and without the Secretary setting the grant aside, even had we concluded that the Secretary could legally sign the grant before allowing the plaintiffs to exercise their procedural rights, we would nevertheless deny the defendants' petition for reconsideration. The plaintiffs were not required to take advantage of the proffered opportunity to discuss their complaints with the Regional Administrator; nor could Secretary Weaver's offer of the Regional Administrator's assistance moot the issues in this case.

The plaintiffs seek to establish a procedural right in this case. They have standing to contest that right not only as private, individual citizens and as a private, definable class of citizens, but also as representatives of the public interest. See Scenic Hudson Preserv. Conf. v. FPC, supra. From the facts alleged in the plaintiffs' complaint, at no time has the Secretary explicitly recognized their procedural rights. There are no administrative regulations providing the details of such procedure; there is no publicly obvious or recognized procedural machinery. Indeed, the entire thrust of the defendants' earlier motion

to dismiss was that the plaintiffs had *no* rights, substantive or procedural, under the National Housing Act. The plaintiffs' entire case probably could have been rendered moot if the Secretary had simply disbursed the funds. We do not believe that the plaintiffs' refusal to pursue the Secretary's apparently gratuitous offer, which would have exposed them to possible jurisdictional foreclosure, should prevent them from attempting to establish their procedural rights in this action. Furthermore, even if the Secretary's letter could somehow be construed as a recognition of the plaintiffs' procedural rights, we do not believe that the recognition would obviate the need for injunctive relief. The procedural right which the plaintiffs seek to establish has never been explicitly recognized before, either by the courts or by HUD. The citizen cannot exercise a right of which he is not aware. The Secretary's private, conciliatory letter to a small group of concerned citizens who have threatened a law suit is not a sufficiently binding, public recognition of a right inuring to the plaintiffs not only as private citizens, but also as representatives of the public. If the facts in the plaintiffs' complaint are true—and they have not yet been denied—then we are satisfied that injunctive relief is necessary in order to firmly and publicly establish the procedural right which the plaintiffs claim. See Bailey v. Patterson, 323 F.2d 201, 205–206 (5th Cir. 1963), cert. denied City of Jackson v. Patterson, 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609 (1963). See also United States v. Oregon State Medical Soc'y., 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952); Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944); Swift & Co. v. United States, 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587 (1928); Lankford v. Gelston, 364 F.2d 197, 201 (4th Cir. 1966).

B. *Motion for Posting of Security:*

The federal defendants have also filed a motion requiring the plaintiffs to post twenty million dollars ($20,000,000.00) security under F.R.Civ.P. 65(c). None of the defendants had raised the question of a security bond at the hearing on the defendants' motion to dismiss. The issue was presented to the Court for the first time on March 4, 1968, one week after the preliminary injunction was issued.

F.R.Civ.P. 65(c) provides in relevant part:

"No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."

At the time when we granted the preliminary injunction, the defendants had not requested the posting of any security. Thus there was no proof showing a likelihood of any injury to the defendants enjoined, and accordingly we did not require any security. See Continental Oil Co. v. Frontier Rfg. Co., 338 F.2d 780, 782 (10th Cir. 1964).

Nor do we believe it appropriate to grant the defendants' present motion for security. First, it has been held that F.R.Civ.P. 65(c) is not applicable when the preliminary injunction has been issued in order to preserve the court's subject matter jurisdiction. See Ferguson v. Tabah, 288 F.2d 665, 675 (2d Cir. 1961); Magidson v. Duggan, 180 F.2d 473, 479 (8th Cir. 1950), cert. denied 339 U.S. 965, 70 S.Ct. 1000, 94 L.Ed. 1374 (1954); Swift v. Black Panther Oil and Gas Co., 244 F. 20, 29–30 (8th Cir. 1917). In the case sub judice, we granted the preliminary injunction because disbursement of the funds to the Philadelphia Redevelopment Authority would have rendered the controverted issues moot.

Additionally, we are only required to set security "in such sum as the court deems proper"; that sum is to be an estimate of the costs and damages suffered by any defendant who has been wrongfully enjoined. F.R.Civ.P. 65(c). We conclude that the federal defendants

in this action, Secretary Weaver, Regional Administrator Phelan, and the Department of Housing and Urban Development, have not alleged any basis for finding them substantially harmed if the preliminary injunction was wrongfully granted.

 The federal defendants assert that the costs of the litigation are estimated at five thousand dollars ($5,000.-00). We do not understand, nor have the defendants indicated, how the amount of these costs will be affected by the propriety of the preliminary injunction. Attorneys' fees and legal expenses spent by the injured party in resisting or appealing the injunction are not recoverable under a bond, nor are they items to be included in the determination of the amount of the bond. See Madison Shipping Corp. v. Nat'l. Maritime Union, 204 F.Supp. 22 (E.D.Pa.1962). Cf. International Ladies Garment Workers Union v. Donelly Garment Co., 147 F.2d 246, 253 (8th Cir. 1945). See also Tullock v. Mulvene, 184 U.S. 497, 511, 513, 22 S.Ct. 372, 46 L.Ed. 657 (1902); Monolith Portland Midwest Co. v. Reconstruction Finance Corp., 128 F.Supp. 824 (S.D.Cal.1955). See also Barron & Holtzoff, 3 Fed.Prac. & Proc. § 1435 at p. 497 (1958).

The federal defendants also argue that the amount of the bond should include certain alleged injuries which the Philadelphia Redevelopment Authority and Drexel Institute may sustain. The federal defendants contend that these injuries would be attributable to the delay caused by the preliminary injunction.

The injuries alleged are highly speculative in nature. Nor would it appear that such harm as might occur would be attributable to the temporary delay occasioned by a preliminary injunction. Furthermore, F.R.Civ.P. 65(c) clearly specifies that the bond should be determined in an amount that will protect "any party who is found to have been wrongfully enjoined or restrained." The protection of the bond appears co-terminous with the power of contempt created by the injunction. The Philadelphia Redevelopment Authority has not been enjoined or restrained by the preliminary injunction at issue. Drexel is not even a party to this action. Whatever harm they may suffer is irrelevant to the security amount under F.R.Civ.P. 65(c).

Further, the federal defendants claim that a change in the money market during the delay caused by the preliminary injunction might increase financing costs to the Department of Housing and Urban Development. The possible increase is too speculative to be considered in determining the amount of security.

 Finally, despite the apparently mandatory language of F.R.Civ.P. 65(c), we believe that the security requirement is in fact and has been frequently held within the discretion of the court. See, e. g., Urbain v. Knapp Bros. Mfg. Co., 217 F.2d 810 (6th Cir. 1954), cert. denied 349 U.S. 930, 75 S.Ct. 772, 99 L.Ed. 1260 (1955); Magidson v. Duggan, supra. If we accepted all the various items alleged by the defendants as proper elements of the security bond, and agreed to require the plaintiffs to post twenty million dollars, the security requirement would effectively prevent judicial review of the Secretary's decision in this and in every other case. It is obvious that plaintiffs who are merely residents in the proposed project site are unlikely ever to be able to meet such an onerous security requirement. Should the plaintiffs have been unable to meet the requirement in this case, the Court could not have issued the preliminary injunction. Disbursement of the federal funds would then have mooted the issues in the case and precluded effective review of the Secretary's decision to authorize funds. Here, a group of citizens have requested that this Court assure them an effective opportunity to prevent a federal agency from ignoring their fundamental procedural rights. We cannot accept the proposition that Rule 65(c) was intended

to raise virtually insuperable financial barriers insulating the agency's decisions from effective judicial scrutiny.

The length of delay created by the preliminary injunction in this case is, to some extent, in the control of the defendants. If the defendants would consolidate all their motions and their answers to the plaintiffs' complaint and file the papers with the Court, we could move forward toward resolution of the plaintiffs' right to final, permanent relief. The factual circumstances relevant to the plaintiffs' right in this case to submit documentary evidence to the Secretary cannot be finally resolved until the defendants have answered the allegations of the plaintiffs' complaint relevant to the Secretary's alleged failure to provide procedural right.

### ORDER

AND NOW, this nineteenth day of April, 1968, for all of the above reasons, IT IS ORDERED that the motion of the above-named federal defendants requesting this Court to require the plaintiffs to post security under F.R.Civ.P. 65(c) in the amount of twenty million dollars ($20,000,000.00) will be and hereby is DENIED.

IT IS FURTHER ORDERED that the above-named defendants' motion for reconsideration of our orders entered on February 27 and 29, 1968, also will be and hereby is DENIED.

All the defendants in the above-captioned action who intend to file answers to the allegations in the plaintiffs' complaint shall file such answers within ten (10) days after notice of the orders here entered. F.R.Civ.P. 12(a).

### SUPPLEMENTARY ORDER

On April 8, 1968, in the above-captioned action, this Court entered a Memorandum and Order denying the motion for reconsideration filed by the defendant, Philadelphia Redevelopment Authority; and denying the motion requiring the plaintiffs to post security filed by the Philadelphia Redevelopment Authority. On April 19, 1968, this Court, in an Order accompanied by a more detailed Opinion, also denied similar motions by the federal defendants in the above-captioned action. The purpose of this present Order is to supplement our April 8, 1968 memorandum explaining our denial of the Philadelphia Redevelopment Authority's motion by incorporating the relevant, pertinent reasoning in our Opinion of April 19, 1968, which denied the federal defendants' motions. Our reasons for denying the federal defendants' motions are equally applicable to the Philadelphia Redevelopment Authority's motions.

AND NOW, this twenty-second day of April, 1968, IT IS ORDERED that the Opinion of this Court in the above-captioned action entered on April 19, 1968, be and hereby is incorporated as supplementary support for our Order in the above-captioned action filed on April 8, 1968.